WILLIAM N. CARLON (State Bar No. 305739)
Law Office of William Carlon
437 Post Street
Napa, CA 94559
(530) 514-4115
william@carlonlaw.com

WILLIAM VERICK (State Bar No. 140972)
Klamath Environmental Law Center
P.O. Box 1128
Arcata, CA 95518
(707) 630-5061
wverick@igc.org

DAVID WILLIAMS (State Bar No. 144479)
Law Offices of David Williams
1839 Ygnacio Valley Road, Suite 351
Walnut Creek, CA 94598
(510) 847-2356
dhwill7@gmail.com

BRIAN ACREE (State Bar No. 202505)
Law Office of Brian Acree
95 3rd Street, Second Floor
San Francisco, CA 94103-3103
(510) 517-5196
brian@brianacree.com

Attorneys for Plaintiff
CALIFORNIANS FOR ALTERNATIVES TO TOXICS

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIANS FOR ALTERNATIVES TO TOXICS,<br><br>         Plaintiff,<br>   vs.<br><br>KERNEN CONSTRUCTION CO., BEDROCK INVESTMENTS LLC, SCOTT FARLEY, AND KURT KERNEN,<br><br>         Defendants. | Case No.: 4:24-cv-04067-YGR<br><br>**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1241-1387)** |

Californians for Alternatives to Toxics ("CAT" or "Plaintiff"), by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 ("Clean Water Act," "CWA," or "Act") against Kernen Construction Co., Bedrock Investments LLC, Scott Farley, and Kurt Kernen ("Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. § 1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On or about March 14, 2024, Plaintiff provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of its intention to file suit against Defendants, as required by the Act.  *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiff mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  A true and correct copy of Plaintiff's CWA Notice Letter is attached hereto as **Exhibit 1**, and is incorporated by reference.

3.      More than sixty days have passed since Plaintiff served this CWA Notice Letter on Defendants and the agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Northern District of California pursuant to Section 505(c)(1)

of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Intra-district venue is proper in San Francisco, California, because the sources of the violations are located within Humboldt County, California.

## II.   **INTRODUCTION**

5.      This Complaint seeks relief for Defendants' violations of the CWA at the approximately 37-acre facility owned and/or operated by Defendants (the "Facility").  Defendants discharge pollutant-contaminated storm water from the Facility into Noisy Creek and Hall Creek, tributaries of the Mad River, which ultimately flows into the Pacific Ocean (collectively the "Impacted Waters").

6.      The Impacted Waters are waters of the United States.

7.      Defendants are violating both the substantive and procedural requirements of the CWA.

8.      Defendants' discharges of pollutant-contaminated storm water from the Facility violate the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 2014-0057-DWQ as amended by Order 2015-0122-DWQ & Order 2018-0028-DWQ ("General Permit" or "Permit").

9.      Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

10.     The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Impacted Waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.

11.     Hall and Noisy Creeks are both critical spawning and rearing habitat for coho salmon. 64 Fed. Reg. at 24,059.  The Southern Oregon/Northern California Coast ("SONCC") coho salmon

have been listed as threatened under the federal Endangered Species Act since 1997.  62 Fed. Reg. at 24,588.

12.     The Final Recovery Plan for the SONCC Coho Evolutionary Significant Unit ("ESU") ("Recovery Plan") identifies the Mad River population of coho has a high extinction risk. Recovery Plan at 2-35.

13.     The Recovery Plan identifies sediment as one of the "key limiting stresses" on the Mad River SONCC coho salmon ESU population.  Recovery Plan at ES-7.  The Recovery Plan also identifies "Impaired Water Quality" as a "Very High" stressor on the Mad River population of coho salmon.  *Id.* at 3-6.

14.     The Mad River Hydrological Unit has been listed as impaired for aluminum pursuant to section 303(d) of the Clean Water Act.

15.     Analysis of samples taken of Defendants' discharges to Noisy Creek show extremely high levels of aluminum.  In addition, Defendants' discharges of storm water from the Lower Yard contain high levels of suspended sediment.

16.     The high levels of suspended sediment in the stormwater discharges from Defendants' Lower Yard harm these threatened fish by filling in the spaces in the gravel the fish use to spawn, and additionally impair these water bodies' production of marine insect larvae, an important food source for coho salmon.

17.     Federal, state and local agencies, in conjunction with private non-governmental organizations, have funded numerous projects in the Impacted Waters to rehabilitate and enhance coho habitat.

III.     **PARTIES**

18.     Californians for Alternatives to Toxics is a non-profit public benefit corporation organized under the laws of California.

19.     Plaintiff's principal address is 415 I Street, Arcata, California 95521.

20.     Plaintiff is dedicated to defending the environment against the effects of toxic chemicals, and to preserving and protecting the wildlife and natural resources of California waters, including the waters into which Defendants discharge polluted storm water associated with industrial

activities.  To further its goals, Plaintiff actively seeks federal and state agency implementation of state and federal water quality laws, including the CWA, and as necessary, directly initiates enforcement actions on behalf of itself and its members.

21.    Members of CAT, including citizens, taxpayers, property owners, and residents, live, work, travel and recreate on, in, and near Hall Creek, Noisy Creek, and the Mad River, into which Defendants cause pollutants to be discharged. These members use and enjoy the Impacted Waters for cultural, recreational, educational, scientific, conservation, aesthetic and spiritual purposes. Defendants' discharges of storm water containing pollutants impairs each of those uses.  Thus, the interests of CAT's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act and the General Permit.

22.    Members of CAT reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CAT use and enjoy the waters of Hall Creek, Noisy Creek, and the Mad River, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CAT use these areas to fish, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.

23.    The interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.

24.    The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

25.    Defendant Kernen Construction Co. is a general partnership between Defendant Scott Farley and Defendant Kurt Kernen organized under the laws of California.

26.    Defendant Bedrock Investments, LLC is a limited liability company organized under the laws of California.

27.    Plaintiff is informed and believes, and thereupon alleges that Defendants own and/or operate the Facility, and are subject to the terms of the General Permit.

28.    Defendants are "persons" pursuant to the Act.  33 U.S.C. § 1362(5).

29.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

## IV.   **LEGAL BACKGROUND**

### A.     **Clean Water Act**

30.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2). To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

31.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

32.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6).

33.     A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

34.     "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7). Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters. 40 C.F.R. § 120.2 (Sept. 8, 2023).

35.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. § 1342(p), and, specifically,

requires an NPDES permit for storm water discharges associated with industrial activity.  33 U.S.C. § 1342(p)(2)(B).

36.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); 33 U.S.C. § 1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

37.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $66,712 per day for violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4.

**B.      California's General Industrial Storm Water Permit**

38.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

39.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

40.     The State Board elected to issue a statewide general permit for industrial discharges. The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on April 17, 1997, and again on April 1, 2014 (effective July 1, 2015), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).  The General Permit was amended on August 4, 2015, and again on November 6, 2018, and the current General Permit, Order WQ 2018-0028-DWQ, became effective July 1, 2020.

41.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires facilities to file their NOIs before the initiation of industrial operations.

42.     Once regulated by an NPDES permit, facilities must strictly comply with all of the terms and conditions of that permit.  A violation of the General Permit is a violation of the Act.  *See* General Permit, Section XXI.A.

43.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

44.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

45.     Discharge Prohibition III.B of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance as defined in section 13050 of the California Water Code.  Receiving Water Limitation VI.A of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water.  Receiving Water Limitation VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.

46.     Effluent Limitation V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

47.     The 2008, 2015, and 2021 versions of U.S. EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities include numeric standards called benchmarks, which are pollutant concentration values for industrial storm water discharges ("U.S. EPA Benchmarks").  *See* United States Environmental Protection Agency NPDES Multi-Sector General Permit for Storm Water Discharges Associated with Industrial Activity, effective September 29, 2008, effective June 4, 2015, and effective September 29, 2021.

48.     U.S. EPA Benchmarks serve as objective measures for evaluating whether the BMPs designed and implemented at a permittee facility achieve the statutory BAT/BCT standards.  *See* 80 Fed. Reg. 34403, 34405 (June 16, 2015); *see also* 73 Fed. Reg. 56572, 56574 (Sept. 29, 2008); 65 Fed. Reg. 64746, 64766-67 (Oct. 30, 2000).

49.     The discharge of storm water containing pollutant concentrations exceeding U.S. EPA Benchmarks evidence a failure to develop and implement pollution control strategies that achieve BAT/BCT-level pollutant reductions.  *See Santa Monica Baykeeper v. Kramer Metals, Inc. ("Kramer")*, 619 F. Supp. 2nd 914, 921-25 (C.D. Cal. 2009); *see also* 80 Fed. Reg. 34403, 34405 (June 16, 2015).

50.     The following benchmarks have been established, effective September 29, 2021, for pollutants discharged by Defendants: total suspended solids – 100 mg/L; oil & grease – 15.0 mg/L; chemical oxygen demand – 120 mg/L; pH – 6.0-9.0 s.u.; zinc – 0.120 mg/L; aluminum – 1.1 mg/L; lead – 0.082 mg/L; nitrate and nitrite nitrogen – 0.68 mg/L; and, copper – 0.00519 mg/L.

51.     The California Toxics Rule ("CTR") is an applicable water quality standard under the Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314, *21 (E.D. Cal. 2015).

52.     CTR establishes numeric receiving water limits for toxics pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes a numeric limit for at least some of the pollutants discharged by Defendants: zinc – 0.12 mg/L (maximum concentration); copper – 0.013 mg/L (maximum concentration); and, lead – 0.065 mg/L (maximum concentration).

53.     The Water Quality Control Plan for the North Coast Region ("Basin Plan") sets forth water quality standards and prohibitions applicable to Defendants' storm water discharges from its

Facility.  The Basin Plan includes a narrative toxicity standard which states that "(a)ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in human, plant, animal, or aquatic life."  Basin Plan at 3-6; 4-34.

54.     The Basin Plan's Water Quality Standards require a narrower pH range of 6.5 – 8.5 pH units for inland surface waters such as Hall Creek, Noisy Creek, and the Mad River.

55.     The Basin Plan identifies present and potential beneficial uses for the Mad River, which include municipal and domestic water supply, hydropower generation, agricultural supply, industrial service supply, navigation, wildlife habitat, warm freshwater habitat, cold freshwater habitat, warm and cold spawning, and contact and non-contact water recreation.

56.     The Basin Plan sets forth water quality objectives to protect these beneficial uses.

57.     Waters designated for use as domestic or municipal supply shall not contain concentrations of chemical constituents in excess of the limits specified in California Code of Regulations, Title 22, Chapter 15.  Basin Plan, Section 3.3.3, pp. 3-3, 3-4.

58.     The primary maximum contaminant level for aluminum is 1.0 mg/L and the secondary maximum contaminant level for aluminum is 0.2 mg/L.

59.     Waters that cannot support the identified beneficial uses are designated as "impaired" by the Water Board.  Clean Water Act, section 303(d).

60.     The Water Board reviews all available water quality data on a waterbody to determine whether the waterbody should be listed as impaired.

61.     Due to numerous exceedances of the secondary maximum contaminant level – the applicable water quality objective – the Water Board has identified the Mad River Hydrologic Unit as impaired for aluminum.  Final California 2020-2022 Integrated Report (303(d) List).

62.     Discharges of storm water containing aluminum that exceed the secondary maximum contaminant level of 0.2 mg/L to the Mad River, and its tributaries, therefore cause or contribute to the continued listing of the Mad River HU as impaired for aluminum.

63.     The General Permit requires dischargers to develop and implement a site-specific SWPPP.  General Permit, Section X.A.  The SWPPP must include, among other elements:  (1) the facility name and contact information; (2) a site map; (3) a list of industrial materials; (4) a

description of potential pollution sources; (5) an assessment of potential pollutant sources; (6) minimum BMPs; (7) advanced BMPs, if applicable; (8) a monitoring implementation plan; (9) an annual comprehensive facility compliance evaluation; and (10) the date that the SWPPP was initially prepared and the date of each SWPPP amendment, if applicable.

64.     Dischargers must revise their SWPPP whenever necessary and certify and submit via the Regional Board's Storm Water Multiple Application and Report Tracking System ("SMARTS") their SWPPP within 30 days whenever the SWPPP contains significant revisions(s); and, certify and submit via SMARTS their SWPPP not more than once every three (3) months in the reporting year for any non-significant revisions.  General Permit, Section X.B.

65.     Dischargers must implement the minimum BMPs identified in Section X.H.1. of the General Permit.  In addition to the minimum BMPs identified in Section X.H.1, advanced BMPs must be implemented if necessary to reduce or prevent discharges of pollutants in storm water dischargers in a manner that reflects best industry practice.  General Permit, Section X.H.2.

66.     Special Conditions Section XX.B of the General Permit require a discharger to prepare and submit documentation to the Regional Board upon determination that storm water discharges are in violation of Receiving Water Limitations, Section VI.  The documentation must describe changes the discharger will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  General Permit, Section XX.B.

67.     Section XV of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities within 90 days of the annual evaluation.

68.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Section IV of the General Permit unless authorized by another NPDES permit.  General Permit, Section III. B.

69.     The General Permit requires dischargers to implement a Monitoring Implementation Plan.  General Permit, Section X.I.  As part of their monitoring plan, dischargers must identify all

storm water discharge locations.  General Permit, Section X.I.2.  Dischargers must then conduct monthly visual observations of each drainage area, as well as visual observations during discharge sampling events.  General Permit, Section XI.A.1 and 2.  Dischargers must also collect and analyze storm water samples from two (2) storm events within the first half of each reporting year (July 1 to December 31) and two (2) storm events during the second half of each reporting year (January 1 to June 3).  General Permit, Section XI.B.  Section XI.B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS") and oil and grease ("O&G"), certain industry-specific parameters, and any other pollutants likely to be in the storm water discharged from the facility base on the pollutant source assessment.  General Permit, Section XI.B.6.

70.     Dischargers must submit all sampling and analytical results via SMARTS within thirty (30) days of obtaining all results for each sampling event.  Section XI.B.11.  Sampling results must be compared to the two types of Numeric Action Level ("NAL") values set forth at Table 2 of the General Permit.  General Permit, Section XII.  An annual NAL exceedance occurs when the average of the results for a parameter for all samples taken within a reporting year exceeds the annual NAL value.  General Permit, Section XII.A.1.  An instantaneous NAL exceedance occurs when two (2) or more results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value.  General Permit, Section XII.A.2.  If a discharger has an NAL exceedance during a reporting year, the discharger's status changes to Level 1 status under the General Permit and the discharger must comply with the requirements set forth for Level 1 status operators set forth at Section XII.C.  The discharger's status shall change to Level 2 status if sampling results indicate an NAL exceedance for a parameter while the discharger is in Level 1 status.  If a discharger becomes Level 2 status it must comply with the obligations set forth at Section XII.D of the General Permit.

71.     Dischargers must submit an Annual Report no later than July 15th following each reporting year certifying compliance with the Permit and/or an explanation for any non-compliance.  General Permit, Section XVI.

**V.      STATEMENT OF FACTS**

72.     On August 8, 2016, Plaintiff filed a First Amended Complaint alleging violations of the Clean Water Act arising from Defendants' operations at the Facility.  That case was styled *Californians for Alternatives to Toxics v. Kernen Construction Co., Bedrock Investments, LLC, Kurt Kernen, and Scott Farley*, Case No. 4:16-cv-04007-YGR ("2016 Case").

73.     On September 5, 2017, the Parties entered into a settlement agreement ("2017 Agreement") that resolved the claims brought in the 2016 Case.  The 2016 Case alleged violations at the Facility from August 8, 2011 to November 13, 2017, and the 2017 Agreement resolved only the violations occurring in that time frame.

74.     On February 21, 2020, Plaintiff filed a new complaint against Defendants, again alleging violations of the Clean Water Act arising from Defendants' operation at the Facility.  That case was similarly-styled as the 2016 Case, with a case number of 3:20-cv-01348-YGR-LB ("2020 Case").

75.     Defendants answered the 2020 Case complaint by admitting the allegations.

76.     The court entered judgment in favor of Plaintiff, and imposed $2,087,750 in civil penalties for 9,461 violations of the Clean Water Act occurring between November 14, 2017 and May 2, 2021.

77.     The court issued a permanent injunction against Defendants that expired May 1, 2023.

78.     The court awarded Plaintiff its fees and costs, and Plaintiff' subsequently engaged in post-judgment enforcement to collect its award of fees and costs.

79.      Defendants conduct industrial activities both indoors and outdoors at the approximately 37-acre Facility.  Industrial activities at the Facility include, but are not limited to: manufacturing and storing rock aggregate products, storing scrap roofing shingles, storing scrap metal, storing soil and organic debris.

80.     Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms, and other storm water controls. Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

81.     The Facility operates under Standard Industrial Classification ("SIC") Codes 5093 ("Scrap and Waste Materials") and 1422, 1423, and 1429 ("Crushed and Broken Limestone, Granite, and Stone").

82.     On August 30, 2018, Defendants submitted a Notice of Information Change to the Regional Board which changed their reported SIC Code from 5093 to 4212 ("Local Trucking Without Storage").

83.     Defendants submitted a Notice of Intent to comply with the General Permit for the Facility on or about June 8, 2015.

84.     The Facility is assigned the Waste Discharge Identification Number 1 12I017319.

85.     Since at least June 8, 2015, the Facility has operated under General Permit coverage.

86.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards.

87.     The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with dust, stored soil, crushed rock and other sources of contaminants, thereby allowing storm water to flow over and across these materials, as well as heavy trucks and construction equipment, and become contaminated prior to leaving the Facility.

88.     In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

89.     During rain events, storm water laden with pollutants discharges from the Facility to a small creek, known as Noisy Creek, before discharging to Hall Creek, a tributary to the Mad River, which flows to the Pacific Ocean near McKinleyville, California.

90.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to Noisy Creek and Hall Creek during significant rain events.

91.     Information available to Plaintiff indicates that Defendants have not fulfilled the

requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of significantly contaminated storm water.

92.     On May 21, 2024, the Regional Board issued a Notice of Violation of Water Code Section 13267 Investigative Order R1-2022-0025 and Industrial General Permit Order No. 2014-0057-DWQ for Kernen Construction and Directive to Apply for Water Quality Certification/Waste Discharge Requirements for Activities in Waters of the State pursuant to Water Code section 13260.

93.     The Regional Board's Notice of Violation alleges that Kernen Construction violated Section III of the General Permit which prohibits industrial storm water discharges and authorized non-storm water discharges containing pollutants that cause or threaten to cause pollution, contamination, or nuisance.

94.     The Regional Board's Notice of Violation alleges that Kernen Construction violated Section V of the General Permit by failing to implement required minimum BMPs at the Facility, including BMPs to minimize or reduce the discharge of sediment and other pollutants in the Facility's storm water discharges.

95.     The Regional Board's Notice of Violation alleges that Kernen Construction violated Section X.B of the General Permit by failing to revise the SWPPP and site map since 2022 to reflect current conditions at the site.

96.     The Regional Board's Notice of Violation alleges that Kernen Construction violated Section X.H.1 of the General Permit by failing to implement minimum BMPs such as good housekeeping, preventative maintenance, spill and leak prevention and response, material handling and waste management, and erosion and sediment control.

97.     The Regional Board's Notice of Violation alleges that Kernen Construction violated Section XI.B of the General Permit by failing to collect any samples of storm water discharges from the Facility since 2020.

98.     Defendants' Facility is divided into two separate areas, the Upper Yard and the Lower Yard.

99.     Industrial activities in the Upper Yard include storage and manufacture of rock aggregate products; crushing and sorting; storage of soil and organic debris; storage of scrap roofing

shingles; a truck shop; storage of scrap metals and equipment; and vehicle fueling, maintenance, and cleaning.

100.    Storm water generated in the Upper Yard generally flows to the south and is collected in a storm water collection system that runs along the southern boundary of the Upper Yard.

101.    The Facility's February 2022 SWPPP states that if the storm water collection system were to reach capacity, the Upper Yard would discharge storm water from several points along the southern boundary of the Upper Yard.

102.    Industrial activities in the Lower Yard include equipment storage, and soil stockpiles.

103.    The Facility's February 2022 SWPPP states that storm water from the Lower Yard is captured in vegetated swales.

104.    Plaintiff is informed and believes that the Facility discharges storm water associated with industrial activities from additional discharge points not identified by the February 2022 SWPPP.

105.    Storm water associated with industrial activities generated within the Lower Yard discharges into Noisy Creek.

106.    Defendants' neighbors have documented, repeatedly, discharges of polluted storm water from the Lower Yard into Noisy Creek.

107.    Plaintiff's representatives have sampled discharges of polluted storm water from the Lower Yard, and laboratory analysis of those samples indicates high levels of pollutants, including high levels of sediment, aluminum, and iron.

108.    According to the February 2022 SWPPP, the storm water discharged from the Facility flows to Noisy and Hall Creeks, which are tributaries to the Mad River.

109.    From the Mad River, storm water carrying pollutants discharged from the Facility flows into the Pacific Ocean.

110.    Noisy Creek is a water of the United States.

111.    Hall Creek is a water of the United States.

112.    The Mad River is a water of the United States.

113.    The Pacific Ocean is a water of the United States.

114.     Defendants discharge storm water containing pollutants, including sediment, compounds increasing chemical oxygen demand, aluminum, copper, iron, lead, nitrogen, acetone, pentachlorophenol, and polychlorinated biphenyls from the Facility during every significant rain event.

115.     Each industrial process undertaken by Defendants at the Facility represents a pollutant source that, pursuant to the General Permit, must be disclosed, assessed, and controlled to prevent or limit pollutant concentrations in storm water discharges.  General Permit, § X.G.1-2.

116.     The Facility's SWPPP has not been revised since February 2022 to reflect current conditions at the Facility.

117.     The Facility's SWPPP fails to accurately identify each discharge point at the Facility.

118.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan at the Facility.

119.     Defendants' SWPPP does not include a compliant site map, adequate pollutant source descriptions or assessments, adequate BMPs or descriptions of BMPs.

120.     Defendants have failed to sample storm water discharges from their Facility for approximately four years.

121.     Defendants have conducted and continue to conduct industrial activities at the Facility without developing, implementing, or revising a compliant Monitoring Plan.

122.     Defendants have failed to conduct required sampling and analysis of Qualified Storm Events, and has failed to analyze samples collected for all required pollutants at its Facility.

## VI.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Defendants' Discharges of Contaminated Storm Water from the Facility
in Violation of the General Permit's Effluent Limitations, Receiving Water Limitations, and
Discharge Prohibitions, and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f))**

123.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

124.     Since at least May 2, 2023, Defendants have discharged storm water polluted with sediment, compounds increasing chemical oxygen demand, aluminum, copper, iron, lead, nitrogen,

acetone, pentachlorophenol, and/or polychlorinated biphenyls from the Facility to Hall Creek and Noisy Creek, and into the Mad River, and ultimately the Pacific Ocean,

125.     Plaintiff is informed and believes, and thereon alleges, that during every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with these pollutants, flowing untreated from the Facility into Hall Creek and Noisy Creek, and into the Mad River and Pacific Ocean in violation of the Effluent Limitations in Section V of the General Permit.

126.     Aluminum can accumulate on the surfaces of a fish's gill, leading to respiratory disfunction and possibly death.  Sediment harms salmon spawning habitat and, by filling in spaces between gravel on the creek and river beds, reduces the water bodies' productivity of aquatic insect larvae, a principal food source for salmonids.

127.     California Fish and Game Code section 5650(a)(6) prohibits the discharge to waters of the state any substances that are harmful to fish.  Behavior that is prohibited by law constitutes a public nuisance.

128.     Defendants' discharges of industrial storm water containing aluminum in concentrations that exceed water quality standards violates California Fish and Game Code section 5650(a)(6).

129.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water associated with Defendants' industrial activities are adversely affecting human health and the environment in violation of Receiving Water Limitations VI.A and VI.B of the General Permit.

130.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation VI.A of the General Permit.

131.     Defendants' violations of the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations are ongoing and continuous.

132.     Each and every violation of any of the General Permit's Discharge Prohibitions,

Effluent Limitations, and Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act.  33 U.S.C. § 1311(a).

133.   Every day, since at least May 2, 2023, that Defendants have discharged polluted storm water from the Facility in violation of the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations is a separate and distinct violation of section 301(a) of the Act. 33 U.S.C. § 1311(a).

134.   Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 2, 2023 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

135.   An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiff and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

136.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**SECOND CLAIM FOR RELIEF**
**Defendants' Failure to Prepare, Implement, Review, and**
**Update a Compliant Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

137.   Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

138.   Defendants have failed to develop and implement an adequate SWPPP for its Facility, in violation of General Permit Section X.

139.   Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

140.   Defendants' violations of the General Permit's SWPPP requirements are ongoing and continuous.

141.   Each day since May 2, 2023 that Defendants have failed to develop and implement an

adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

142.    Defendants have been in violation of the General Permit's SWPPP requirements every day since May 2, 2023.  Violations continue each day that an adequate SWPPP for the Facility is not developed and fully implemented.

143.    Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 2, 2023 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

144.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiff and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

145.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

146.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

147.    Defendants have failed, and continue to fail, to reduce or prevent pollutants associated with its industrial activities from being discharged to waters of the United States through the implementation of minimum and advanced BMPs at the Facility that achieve the technology-based BAT/BCT treatment standards.

148.    Defendants discharge storm water from the Facility containing concentrations of pollutants exceeding the BAT/BCT level of control during every significant rain event.

149.    Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the General Permit's

Effluent Limitations and the Act.  *See* General Permit, §§ I.D.32, V.A; 33 U.S.C. § 1311(b).

150.    Defendants violate, and will continue to violate, the General Permit's technology-based pollution control standard each and every time polluted storm water containing concentrations of pollutants exceeding the BAT/BCT level of control are discharged from the Facility.

151.    Each and every violation of the General Permit's technology-based effluent limitations is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

152.    Defendants' violations of the General Permit's technology-based effluent limitations and the Act are ongoing and continuous.

153.    Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 2, 2023 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

154.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiff and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

155.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

### FOURTH CLAIM FOR RELIEF
**Failure to Implement an Adequate
Monitoring Implementation Plan and to Conduct All Required Monitoring at the Facility
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

156.    Plaintiff re-alleges and incorporates all preceding paragraphs as if fully set forth herein.

157.    Defendants have failed to develop and implement a legally adequate monitoring and reporting program for the Facility.

158.    Defendants have failed to collect the required number of samples of storm water discharges from the Facility during each reporting period since at least May 2, 2023, in violation of General Permit Section XI.

159.    Defendants have failed to identify and sample a discharge point located in the Lower Yard that discharges storm water associated with industrial materials and activities directly to Noisy Creek, in violation of General Permit Section XI.

160.    Defendants' violations of the General Permit's Monitoring Plan and Monitoring requirements and the Act are ongoing and continuous.

161.    Defendants are subject to an assessment of civil penalties for each and every violation of the General Permit and Act occurring from May 2, 2023 to the present, pursuant to sections 309(d) and 505 of the Act.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

162.    An action for injunctive relief is authorized by section 505(a) of the Act.  33 U.S.C. § 1365(a).  Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiff and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

163.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## FIFTH CLAIM FOR RELIEF
**Failure to Comply with the Reporting Requirements of the General Permit**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

164.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

165.    Section XVI of the General Permit requires dischargers to submit an annual report certifying various pieces of relevant information relating to the facility's storm water management, including a Compliance Checklist which asks, among other things, how many storm water discharge locations are at the facility.

166.    Defendants submitted an annual report for the 2023-2024 reporting year that was certified on July 10, 2024.

167.    The 2023-2024 annual report states that there are zero storm water discharge locations at Defendants' Facility.

168.    Defendants submitted an annual report for the 2022-2023 reporting year that was

certified on July 7, 2023.

169.    The 2022-2023 annual report states that there are zero storm water discharge locations at Defendants' Facility.

170.    The Facility has at least three discharge locations that the 2022 SWPPP identifies, and several more that are not identified within the 2022 SWPPP, including several located in the Lower Yard.

171.    Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since May 2, 2023.  33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

VII.    **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of the General Permit and the Clean Water Act as alleged herein;

b.   Enjoin Defendants from discharging polluted storm water from the Facility except as authorized by the General Permit;

c.   Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.   Order Defendants to immediately implement storm water pollution control technologies and measures that satisfy BAT and BCT and that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.   Order Defendants to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.   Order Defendants to prepare a SWPPP for its Facility consistent with the General Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendants to pay civil penalties of $66,712 per day per violation for all violations occurring after November 2, 2015, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1–19.4;

h.   Order Defendants to take appropriate actions to restore the quality of navigable waters impaired or adversely affected by their activities;

i.   Award Plaintiff's costs and fees (including reasonable investigative, attorney, witness, compliance oversight and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

j.   Award any such other and further relief as this Court may deem appropriate.

Dated: September 24, 2024                          Respectfully Submitted,

LAW OFFICE OF WILLIAM CARLON

By:   /s/ William N. Carlon

William N. Carlon
Attorneys for Plaintiff
CALIFORNIANS FOR
ALTERNATIVES TO TOXICS